FILED
2026 Sep-25 PM 03:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

**TONECHAE WILLIAMS,**
Plaintiff,

**v.**

**WKW NORTH AMERICA LLC,**
Defendant.

**Case No. 1:24-cv-1086-CLM**

# MEMORANDUM OPINION

Tonechae Williams sues her former employer, WKW North America, LLC ("WKW"). Williams pleads six claims. (Doc. 17). WKW moves for summary judgment on all six claims under Federal Rule of Civil Procedure 56. (Doc. 21). For the reasons stated within, the court will **GRANT IN PART** and **DENY IN PART** WKW's motion. The court will **GRANT** summary judgment on Williams's assault and battery, invasion of privacy, and Title VII retaliatory hostile work environment claims. The court will **DENY** summary judgment on Williams's negligent supervision, retention, and training; wanton supervision, retention, and training; and Title VII retaliation claims. Those claims will proceed to trial.

## BACKGROUND

WKW operates an auto parts plant in Pell City, Alabama. Tonechae Williams is an African American woman who worked in the plant's polish department from May 2022 until WKW fired her in September 2024.

While other issues exist, this case boils down to two questions: (1) Did WKW know that Williams was being sexually harassed by her team leader, Kenyatta O'Neal, and do nothing about it, and (2) did WKW fire Williams because she sued WKW about the alleged sexual harassment? Because WKW seeks summary judgment, this motion turns on whether the parties genuinely dispute the facts that answer these questions.

Because much of Williams's case stems from allegations against Kenyatta O'Neal, the court starts with his role in the case.

**1. Kenyatta O'Neal**

WKW hired Kenyatta O'Neal around February 2015, and fired O'Neal in September 2022, about four months after WKW hired Williams. O'Neal worked in the polish department, ultimately as a team leader. As a team leader, O'Neal reported to the same supervisor as other team members, Manteze "Tezo" Estell, who reported to Dallase Baker, the Department Manager. (Doc. 17 at 6, ¶ 47).

Williams was not the first woman to allege O'Neal sexually harassed her. In 2018, two women in the polish department alleged that O'Neal sexually harassed them with unwanted touching and sexual comments. On October 25, 2018, WKW issued O'Neal a "Level 1" disciplinary action. (*See* Doc. 28-2; Doc. 28-1 at 5). WKW says this discipline handled the matter, and O'Neal was compliant thereafter. Williams says the punishment was too light, and WKW failed to monitor O'Neal's behavior thereafter—ultimately leading to her 2022 complaint.

After she started working at WKW in May 2022, Williams says that she observed and heard from others about O'Neal's inappropriate behavior. Williams saw O'Neal "make sexual comments" and "grab his private area" toward former employee Kelsi West and "smack[] [former employee] Madison [Murphy] on her butt." (Doc. 22-1 at 41). Two other female employees told Williams they had quit working for WKW because of O'Neal's behavior. (*Id.* at 41–42).

Williams alleges that O'Neal directed similar behavior at her. For example, Williams claims that O'Neal:

- made sexual comments frequently, "on an almost daily basis," turning conversations in a "sexual or perverted" direction (Doc. 28-6 at 4);

- asked her, "Are you ready for me?" while looking at his crotch (*Id.*);
- asked what she would do if he kissed her (*Id.*);
- told her he could not wait to lay her down on the table (*Id.*);
- told her to "go to the breakroom, sit on the table, open [her] legs, and he would be right in" (*Id.*);
- kissed her on the jaw/cheek while she was writing on a board with her back turned (*Id.* at 4–5; Doc. 22-2 at 81).

Williams said she would "try [her] best to avoid [O'Neal] because [she] [knew] he's only stopping by to make a sexual or perverted comment." (Doc. 22-2 at 83). When O'Neal kissed Williams, she responded, "Uh, wtf?" and told him that it made her mad that he did that. (*Id.* at 83–84).

Fed up, Williams says that in July 2022, she told team leads Destiny ("Des") Barkley and Anthony Butler that O'Neal had made sexual comments to her, but neither of them reported it to a supervisor. (*Id.* at 81). On September 26, 2022, Williams told Des and Butler that she "could not take O'Neal's comments anymore." (*Id.*). Des and Butler told Supervisor Tezo Estell, who immediately informed Baker, the Department Manager. Baker took Williams to Human Resources (HR) to speak with HR Manager Sonya Heathcock. (*Id.*).

HR launched an investigation, and during the investigation, two male employees reported that O'Neal's inappropriate behavior was common knowledge (Doc. 28-3 at 3, 4; Doc. 22-3 at 5, ¶ 8e); three female employees reported that O'Neal made sexually inappropriate comments to them (Doc. 29 at 15–16); and team lead Des Barkley said that he had reported a different team member's complaint about O'Neal to Estell the same day he was interviewed for the Williams investigation. (*Id.* at 16).

Based on the investigation, HR found that O'Neal had "made inappropriate and unwanted sexual remarks or comments to female team

members, in violation of WKW's policy" and suspended O'Neal the next day. (Doc. 23 at 10, ¶ 22; *id.* at 7, ¶ 19; Doc. 22-1 at 37). WKW terminated O'Neal before he returned to work. When asked why he was fired, O'Neal testified in another lawsuit that WKW told him "because it was the third allegation [of sexual harassment] against me." (Doc. 22-29 at 31).

**2. Sharon Twyman's EEOC Charge and Lawsuit**

You may notice that O'Neal said "third allegation," but only two have been mentioned so far: (1) the 2018 allegation from two women, and (2) the 2022 allegation from Williams. The third refers to former WKW employee Sharon Twyman. On August 2, 2022, Twyman filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) because, Twyman said, WKW terminated her after she complained about O'Neal's harassment. (Doc. 17 at 6–7, ¶¶ 49–60).

On May 8, 2023, Twyman sued WKW for various Title VII and state-law claims. (Doc. 23 at 15, ¶ 38). In June 2023, Williams was identified as a witness in Twyman's lawsuit. (*Id.* at 15, ¶ 39; Doc. 22-1 at 45).

**3. Williams's Lawsuit and Termination (Williams's version)**

On July 8, 2024, Williams—who was still working at WKW—filed this lawsuit in the Circuit Court of St. Clair County, Alabama, alleging negligent and wanton supervision, retention, and training claims and vicarious liability for assault and battery and invasion of privacy. (Doc. 1). WKW removed the case here on August 9, 2024. (*Id.*). Williams says that, after this, Sonya Heathcock from HR started watching her more closely. Williams contends that Heathcock made the decision to fire her in September 2024, in retaliation for filing the lawsuit.

**4. Williams's Attendance and Termination (WKW's version)**

WKW disputes (a) that it fired Williams in retaliation for filing the lawsuit and (b) that Heathcock made the decision. Instead, WKW says that Tori Wheeler recommended firing Williams because of her frequent attendance problems.

a. *The policy:* WKW enforced an attendance policy based on a points system, with four levels of disciplinary action available for violations: level 1, documented coaching; level 2, written warning; level 3, decision making leave/suspension; and level 4, termination. (Doc. 22-10 at 62–64; Doc. 22-15 at 64). Under the policy, "Team Members who accumulated 9 or more points would be terminated, with points rolling off after they have been on the employee's record for a year." (Doc 23 at 4–5). Employees receive a final corrective notice, also called a Step 4 attendance corrective action, before termination. (Doc. 22-5 at 4, ¶ 16).

Tori Wheeler worked as an HR and Payroll Specialist and tracked employees' attendance points. (Doc. 22-3 at 9, ¶ 13). When any employee reached a level of points that merited disciplinary action under the attendance policy, Wheeler would notify the employee's supervisor(s). (*Id.* at ¶ 13a–b).

b. *Williams's record:* Williams had attendance issues throughout her time at WKW. On October 19, 2023, Williams had 6 attendance points and received a Step 2 attendance corrective action. (Doc. 22-1 at 31). On January 19, 2024, Williams had 11.25 attendance points and received a Step 4 final corrective action. At this point, she was eligible for termination. But WKW did not fire Williams.

On August 2, 2024, about a month after Williams sued WKW, Wheeler emailed Heathcock and Rachael McDonald that Williams was eligible to receive another Step 4 final corrective action. (Doc. 22-3 at 10, ¶ 15a–c). Heathcock says that she did not ask Wheeler to run an attendance report on Williams, and that she responded, "Let's talk before we do anything with Tonechae Williams. We need to be 100% careful with isolating her absences." (*Id.* at ¶ 15b). Heathcock says that she wrote that response because she "wanted to be entirely certain that all of the attendance points were justified before taking any further corrective action against her, to avoid any appearance of retaliation for the lawsuit." (*Id.* at ¶ 15c).

As a result of her points, Williams received another Level 4 final corrective action. (*Id.* at ¶ 15d; Doc. 22-1 at 38). On September 25, 2024, Wheeler notified Heathcock that Williams had accrued more attendance points since the second corrective action—giving her 20.5 total points—and recommended Williams's termination. (*Id.* at ¶ 16). Heathcock agreed that Williams was due to be terminated under the attendance policy (*Id.* at ¶ 16a), and she says that she recommended other polish department employees with less points also be terminated. (*Id.*). WKW then terminated Williams. (Doc. 22-15 at 61; Doc. 23 at 4–5, ¶ 6).

### 5. Williams's EEOC charge

Williams filed an EEOC charge of discrimination on November 12, 2024, for retaliation, (doc. 17-1), and the EEOC issued a Notice of Right to Sue on May 5, 2025, (doc. 17-2). Williams then amended her complaint to include Title VII retaliation claims. (Doc. 17). She alleges that WKW "forc[ed] her to train with someone who had directed a racial slur at her,[1] subject[ed] her to heightened scrutiny, look[ed] for reasons to terminate her employment, and terminated her employment." (*Id.* at 17, ¶ 148).

## STANDARD OF REVIEW

In reviewing a motion for summary judgment, this court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. *See Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 966 (11th Cir. 2002). Summary judgment is appropriate when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a

---

[1] Williams alleges that Adrian Cruz directed a racial slur at her, which she reported. (Doc. 17 at 8–9, ¶¶ 80–87; Doc 22-1 at 35). HR immediately investigated and suspended Cruz. (Doc. 22-9 at 34–35). Williams alleges that WKW thereafter ordered her to train with Cruz "to punish her for being a witness in the Twyman matter." (Doc. 17 at 9, ¶¶ 89, 92). Cruz stopped working at WKW a few weeks later, and Williams did not have to work with Cruz again after she reported him. (Doc. 22-1 at 35).

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

In her Amended Complaint, Williams alleges six counts: assault and battery; invasion of privacy; negligent supervision, retention, and training; wanton supervision, retention, and training; Title VII retaliatory hostile work environment; and Title VII retaliation. (Doc. 17). WKW moves for summary judgment on all six. The court starts with the federal claims before moving to the state-law claims.

### A. Williams's Title VII Claims (Counts V, VI)

Williams pleads two Title VII claims: Count V alleges that WKW created a retaliatory hostile work environment, and Count VI alleges that WKW terminated her in retaliation for engaging in a protected activity (*i.e.*, filing this lawsuit). To prove retaliation, Williams must prove that "(1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).

WKW argues that Williams cannot prove her Title VII claims for three reasons. First, WKW says that Williams's state-court lawsuit for sexual harassment was not a protected activity under Title VII. Second, WKW says that it didn't subject Williams to a hostile work environment, so she suffered no adverse employment action until her termination. Third, WKW says that it terminated Williams based on her attendance record, not based on her involvement in protected activity. The court will address each in turn.

#### *a. Statutorily Protected Activity*

Williams argues that she engaged in two protected activities: (1) she testified as a witness in Twyman's lawsuit and (2) she sued WKW. WKW doesn't dispute that Williams's participation in Twyman's lawsuit was

protected activity. But WKW argues that Williams's state-court lawsuit wasn't protected activity because "she was not opposing any practice made unlawful by Title VII or participating in any proceeding under Title VII." (Doc. 23 at 20, 21 (relying on *Mincey v. City of Bremerton*, 38 F. App'x 402, 406 (9th Cir. 2002))).

WKW construes Title VII too narrowly. Title VII protected activity includes discrimination-based lawsuits. *Gerard v. Bd. Of Regents of State of Ga.*, 324 F. App'x 818, 825 (11th Cir. 2009); *Cheatham v. Dekalb Cnty.*, 682 F. App'x 881, 886 (11th Cir. 2017) (holding that county complaint of discrimination was protected activity under Title VII); *McCone v. Exela Tech., Inc.*, 2023 WL 7200949, at *5 (11th Cir. June 28, 2023) ("[T]here is scant authority on whether a state discrimination lawsuit constitutes protected activity under Title VII, but courts have found that state lawsuits can be statutorily protected activity in Title VII retaliation suits."). And under Alabama law, the only way to recover for sexual harassment is to bring the types of tort actions that Williams brings here. *See Machen v. Childersburg Bancorporation, Inc.*, 761 So.2d 981, 983 n.1 (Ala. 1999) ("It is well settled that Alabama does not recognize an independent cause of action for sexual harassment. Instead, claims of sexual harassment are maintained under common-law tort theories such as assault and battery, invasion of privacy, negligent training and supervision, and outrage."). The court thus finds that Williams's state-court lawsuit related to her alleged harassment opposed a practice made unlawful by Title VII—*i.e.,* sexual harassment in the workplace—and was therefore a statutorily protected activity.

*b. Adverse Employment Action*

Retaliation claims require a materially adverse employment action, which includes mistreatment that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 862 (11th Cir. 2020) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (U.S. 2006)). If, individually or taken together, an employer's actions weren't

materially adverse to the employee, the employee's claim fails as a matter of law. *Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1356 (11th Cir. 2024).

Williams says that, in retaliation to her involvement in Twyman's lawsuit, WKW "forc[ed] her to train with someone who had directed a racial slur at her"—Adrian Cruz. (Doc. 17 at 17, ¶ 148). The court will not consider allegations involving Cruz. First, Williams failed to timely assert an EEOC charge for the incident. *See* 42 U.S.C. § 2000e-5(e)(1) ("A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."). The alleged retaliatory action occurred in November 2023, and Williams filed her EEOC charge on November 12, 2024—long after 180 days had passed. (Doc. 23 at 19). Thus, any allegations involving Cruz are untimely. Second, Williams doesn't dispute the arguments WKW made about Cruz in its motion for summary judgment. Thus, she abandoned her arguments related to the incident with Cruz. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 598 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

The rest of Williams's allegations were timely. Williams alleges that after she sued WKW in state court, WKW created a hostile work environment by subjecting her to heightened scrutiny and increased monitoring and looking for reasons to terminate her. (Doc. 17 at 17, ¶ 148). Specifically, Heathcock "walked Williams' are[a] of the floor more frequently" and "watched Williams' [sic] more closely than she had prior to the lawsuit." (*Id.* at 10, ¶ 97–98). Finally, WKW terminated her employment. (*Id.* at ¶ 99).

WKW doesn't dispute that Williams's termination was an adverse employment action. *See Rodriguez v. City of Doral*, 863 F.3d 1343, 1350 (11th Cir. 2017) ("Of course, termination constitutes an adverse employment action."). But WKW says it didn't take any other materially adverse actions against Williams. WKW argues that increased monitoring and scrutiny is insufficient to dissuade a reasonable worker from

engaging in protected activity. (Doc. 23 at 26–27). And WKW stresses that this didn't dissuade Williams from engaging in protected activity—she filed this lawsuit while still employed there. (*Id.* at 27 (citing *Bush v. Regis Corp.*, 257 F. App'x 219, 222 (11th Cir. 2007))).

The court agrees. Williams alleges only that she experienced increased supervision and monitoring and that WKW "looked for reasons to terminate her." (Doc. 17 at 17, ¶ 148). But increased monitoring and scrutiny isn't an adverse employment action. *See, e.g.*, *Debe v. State Farm Mut. Auto. Ins. Co.*, 860 F. App'x 637, 639 (11th Cir. 2021) (affirming district court's holding finding no adverse employment action when "unjustified coaching, increased scrutiny, unfounded discipline, file padding . . . , an unwanted schedule change, and a drop memorandum" "did not result in objective harm"); *Raybon v. Ala. Space Sci. Exhibit Comm'n*, 337 F. Supp. 3d 1153, 1170 (N.D. Ala. 2018) (holding, in the context of a hostile work environment claim, that "rearrangement of the office suite, the direction to cease personal telephone calls in the suite, and the monitoring of plaintiff's activities were legitimate efforts [] to maintain a productive work environment").

Considered individually or taken together, WKW's actions wouldn't deter a reasonable individual from making a charge of discrimination and thus weren't materially adverse employment actions. And as WKW points out, the fact that Williams filed her EEOC charge while still employed at WKW, though not decisive, shows that these actions did not in fact deter her. *See Bush*, 257 F. App'x at 222 (affirming grant of summary judgment on retaliation claim when plaintiff failed to establish an adverse action and noting that "none of these instances deterred [plaintiff] from filing her complaint").

The court therefore **GRANTS** summary judgment on Williams's retaliatory hostile work environment claim (Count V). This leaves Williams's retaliation claim based on her termination (Count VI).

*c. Causal Link*

WKW's last argument is that it fired Williams because of her poor attendance, not because of her lawsuit. In other words, Williams cannot prove that her lawsuit 'caused' her termination. Before the court addresses the parties' causation arguments, it reiterates its previous statement about the proper framework for deciding a Rule 56 motion:

> The parties brief this issue in part by using the *McDonnell Douglas* burden-shifting framework. But the Eleventh Circuit has signaled a departure from *McDonnell Douglas* toward a more basic, Rule 56-based inquiry: Has the Plaintiff submitted enough evidence to allow a reasonable juror to find that the Defendant employer acted against Plaintiff because she engaged in protected activity under Title VII? *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023) ("The legal standard—and the question for the court at summary judgment—is only whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee"); *Tynes v. Fla. Dep't of Juv. Justice*, 88 F. 4th 939, 946-47 (11th Cir. Dec. 12, 2023) ("This rearticulation of the summary judgment standard arose in large part because of widespread misunderstandings about the limits of *McDonnell Douglas*—the same misunderstandings that persist today. A 'convincing mosaic' of circumstantial evidence is simply enough evidence for a reasonable factfinder to infer intentional discrimination in an employment action—the ultimate inquiry in a discrimination lawsuit."). In a recent Title VII case, Justice Thomas likewise criticized *McDonnell Douglas's* use in judging Rule 56 motions and said that "litigants and lower courts are free to proceed without the *McDonnell Douglas* framework." *Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1555 (2025).

> This court will continue to follow the Circuit and Justice Thomas's lead by judging [WKW's] motion only under Rule 56.

*Chames v. Wade*, 2025 WL 2263447, at *5 (N.D. Ala., Aug. 7, 2025).

Williams can prove causation if she can show that her lawsuit against WKW was a but-for cause of WKW's decision. On its own, close temporal proximity between protected activity and an adverse employment action isn't enough to establish but-for causation. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1137 n.15 (11th Cir. 2020) (en banc). But close temporal proximity between the two events combined with other evidence, such as deviation from a company's standard procedures, can establish that the reasons given for a plaintiff's firing were pretext for unlawful retaliation. *See Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1352–55 (11th Cir. 2022).

A plaintiff must also establish through direct or circumstantial evidence "that the employer was actually aware of the protected expression at the time it took adverse employment action." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (quoting *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)). The inquiry focuses on the decision maker—the person who actually decided to fire the employee must have known that the employee had engaged in statutorily protected activity, or the decision couldn't have been retaliatory. *See Clover*, 176 F.3d at 1354 (assessing decision maker's actual knowledge of employee's protected activity for retaliation claim); *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020) (same).

1. *WKW's Evidence of Non-Retaliatory Termination*

Rule 56(a) starts with the moving party's burden to show that there is no genuine dispute about a material fact—here, the causal link between Williams's lawsuit and her termination. WKW says that Williams's lawsuit played no part in WKW's decision to fire her. Instead, WKW says that it can't be genuinely disputed that Williams's attendance record was

the sole reason for her termination under company policy. And WKW stresses that Wheeler, who initiated the termination, did not know of Williams's lawsuit, so the termination couldn't have been retaliatory. (Doc. 30 at 3).

Even though Wheeler may not have known about Williams's lawsuit, the record evidence does not support Wheeler being deemed the decision maker. In her declaration, Heathcock calls Wheeler's email a "recommendation," and Heathcock says that she "approved Ms. Williams's termination." (Doc. 22-3 at 11, ¶ 16c). And it's undisputed that Heathcock knew about Williams's lawsuit and other protected activity. So there is no genuine dispute that WKW's decision maker knew about Williams's protected activity at the time of her termination.

The court finds that WKW does, however, present enough evidence to support that it terminated Williams based on her attendance record. It's undisputed that Williams had over 20 attendance points, making her eligible for termination at the time WKW fired her. It is also undisputed that WKW issued Williams multiple corrective actions for attendance and issued her a final corrective notice before her termination.

WKW also presents evidence that could sever a causal connection between Williams's protected activity and her termination: intervening misconduct and time. Williams's intervening misconduct after she engaged in protected activity was accruing over 20 attendance points. (Doc. 30 at 3). And WKW fired Williams two years after she complained about O'Neal and over two months after she filed her lawsuit.

WKW presents evidence that would allow a reasonable juror to find that it terminated Williams based on her attendance record. So the question becomes whether Williams has evidence that would allow the same reasonable juror to instead find that WKW terminated her because she engaged in protected activity, thus creating a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); 56(e).

*2. Williams's Evidence of Retaliatory Termination*

Williams doesn't dispute that her attendance record made her eligible for termination under WKW's policy. Instead, she argues that her attendance was pretext for WKW's true reason for firing her: she engaged in protected activities. (Doc. 29 at 32).

Williams has no direct evidence that WKW terminated her because she engaged in protected activity. Williams points to the following facts as indirect evidence:

- WKW did not consistently enforce its attendance policy and continued to employ employees who exceeded permissible points under the attendance policy, including Williams.
- WKW waited over a year after Williams accrued 9 attendance points to terminate her, ultimately terminating her when she had accrued 20.5 attendance points.
- On August 2, 2024, less than a month after Williams sued WKW in state court, Heathcock emailed Wheeler, "[w]e need to be 100% careful with isolating her absences," a statement Heathcock later said she wrote because she wanted "to avoid any appearance of retaliation for the lawsuit." (Doc. 22-3 at 10, ¶ 15c).

Williams argues that the fact that WKW didn't initiate her termination when she was eligible in the past, the temporal proximity between her termination and her lawsuit, and Heathcock's email "create[] a question of fact as to whether [] Williams' protected act is the reason for her termination." (Doc. 29 at 28).

The court agrees. The court recognizes that close temporal proximity alone isn't enough to establish retaliation. *See Gogel*, 967 F.3d at 1137 n.15. But a reasonable juror could find that the combination of WKW's selective enforcement of the attendance policy, plus the short time frame between Williams's lawsuit and her termination, show that WKW used the attendance policy as pretext for another motive. *See Patterson*,

38 F.4th at 1353–55. The same juror could find that Heathcock's statements, acknowledging the pending lawsuit, suggest the true motive was Williams filing her lawsuit. *See id.* at 1354. As a result, the court finds that Williams offers enough evidence to create a genuine dispute of material fact about causation.

—

Because the parties genuinely dispute the facts needed to prove Williams's Title VII retaliation claim based on her termination (*i.e.*, Count VI), the court **DENIES** WKW's motion for summary judgment on that count.

## B. Williams's State Law Claims

Williams's remaining claims arise under state law. The court starts with Williams's claims of vicarious liability for O'Neal's assault and battery (Count I) and invasion of privacy (Count II).

### 1. Vicarious Liability for Intentional Torts (Counts I, II)

Williams argues that WKW is liable for the assault and battery and invasion of privacy that O'Neal committed against her. (Doc. 17 at 10–13).

Under Alabama law, an employer can be liable for its employee's intentional torts if (1) "the employee's acts are committed in furtherance of the business of the employer"; (2) "the employee's acts are within the line and scope of his employment"; or (3) "the employer participated in, authorized, or ratified the tortious acts." *Ex parte Atmore Cmty. Hosp.*, 719 So.2d 1190, 1194 (Ala. 1998). Williams doesn't dispute that O'Neal's actions were not committed in furtherance of WKW's business and were not within the scope of his employment. (Doc. 29 at 25–26). Williams argues only that WKW ratified O'Neal's tortious conduct by failing to stop it. (*Id.* at 21).

To establish that an employer ratified its employee's tortious acts, a plaintiff must show:

> (1) [that the employer] had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take "adequate" steps to remedy the situation.

*Potts v. BE & K Constr. Co.*, 604 So. 2d 398, 400 (Ala. 1992). "[W]here the specific tortious conduct stops after corrective action by the employer, . . . the corrective action is adequate as a matter of law." *Atmore*, 719 So. 2d at 1194. But if an employer learns of tortious conduct and fails to act to stop it, this "will support an inference that the employer tolerated the conduct." *Potts*, 604 So. 2d at 400.

WKW doesn't dispute O'Neal's conduct but argues that it had no notice of sexual harassment directed at Williams until she complained in September 2022. (Doc. 23 at 29–30). And when she did complain, WKW immediately investigated, suspended, and ultimately terminated O'Neal. (*Id.*). Thus, WKW argues that it adequately responded when it learned of O'Neal's conduct directed at Williams.

The court agrees. Williams's claim fails for two reasons: WKW had no notice of O'Neal's harassment directed at Williams, and WKW took adequate steps to remedy the situation when it received such notice.

First, Williams emphasizes that WKW knew of O'Neal's prior harassment of other employees but fails to show that WKW was aware of harassment directed at her. Although Williams alleges that she told Destiny Barkley and Anthony Butler in July 2022 that O'Neal had sexually harassed her, Williams presents no evidence that Barkley or Butler relayed her 2022 report to a supervisor or HR. And Williams does not contend that supervisors or management within WKW knew of O'Neal's behavior directed at her from her report in July. Because WKW did not have notice of prior tortious conduct "directed at and visited upon

the complaining employee," WKW can't be vicariously liable. *Potts*, 604 So. 2d at 400.

Second, WKW acted immediately after Williams's September 26, 2022, report. Heathcock started her investigation the same day, and WKW suspended O'Neal the next day. WKW ultimately fired O'Neal before he returned. This action was adequate as a matter of law because it promptly stopped O'Neal's tortious conduct against Williams. *Atmore*, 719 So. 2d at 1194. Once WKW management knew about the allegation, Williams never had to interact with O'Neal again because he never returned to work at WKW.

As a result, the court finds that Williams fails to create a genuine dispute that WKW "participated in, authorized, or ratified the tortious acts" of O'Neal against William. *Id.* Because this is Williams's lone theory of vicarious liability against WKW, the court **GRANTS** summary judgment to WKW on Counts I and II.

**2. Negligent/Wanton Supervision, Retention, and Training**

Williams alleges that, "WKW knew that O'Neal was sexually harassing female employees but did not take any steps to remedy or stop his behavior." (Doc. 29 at 29). So in her remaining claims, Williams alleges that WKW negligently (Count III) and wantonly (Count IV) supervised, retained, and trained O'Neal. (Doc. 17 at 13–17).

In claims for negligent or wanton supervision, retention, or training, an employer can be liable for an employee's incompetency if (1) the employer hired, trained, or supervised an employee with an incompetency; (2) the employer knew of the incompetency or would have learned of it by exercising due care; and (3) the employee's incompetency caused the plaintiff harm. *See Jones Express, Inc. v. Jackson*, 86 So. 3d 298, 305 (Ala. 2010). To prove negligence, the plaintiff must show that the employer breached a duty in the supervision, retention, or training of the harasser, and that the breach caused the plaintiff harm. *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So.2d 665, 679 (Ala. 2001). An employer's breach

rises to wantonness if the employer displayed "reckless indifference to the consequences of [an] act, … failure or omission" or had an awareness "that [the] conduct would probably result in injury to another." *Id.* at 679–80.

Now let's apply the general rule to claims of sexual harassment. "A party alleging negligent or wanton supervision or retention must also prove the underlying wrongful conduct of employees." *Tison v. Alachua Straw Co., LLC*, 444 F. Supp. 3d 1344, 1359 (M.D. Ala. 2020) (quoting *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003)). Generally, this means proving that the incompetent employee committed a tortious action, but there is an exception to the tort requirement in sexual harassment cases. *See Andazola v. Logan's Roadhouse, Inc.*, 871 F. Supp. 2d. 1186, 1225 (N.D. Ala. 2012). Because Alabama doesn't recognize a cause of action for sexual harassment, plaintiffs can instead prove that an employer mishandled a sexual harassment complaint and that the sexual harassment underlying the complaint occurred. *Id.* (quoting *Stevenson v. Precision Standard, Inc.*, 762 So.2d 820, 825 (Ala. 1999) ("'[T]he manner in which a sexual-harassment complaint is handled when sexual harassment has, in fact, occurred c[an] form the basis for a claim for negligent or wanton supervision' when the handling of the complaint did not cause the harassment to cease or caused it to only temporarily cease.")). If an employer responds in a manner that stops the harassment, then the employer has an affirmative defense to claims of negligent or wanton supervision. *Stevenson*, 762 So.2d at 825.

Put together, that means Williams must prove that O'Neal committed assault and battery, invasion of privacy, or sexual harassment + mishandling by WKW; that WKW knew or should have known about O'Neal's commission of these bad acts with due diligence; and, that WKW failed to respond appropriately. The court takes the issues in that order.

### A. O'Neal's commission of bad acts

As explained, Williams must first provide enough evidence to allow a reasonable juror to find that O'Neal committed either tort action—assault and battery or invasion of privacy—or that O'Neal sexually

harassed female employees. Though Williams only needs to be able to have sufficient proof of one underlying act to move forward, the court addresses all three grounds.

But first, the court notes that WKW doesn't dispute that O'Neal's bad acts occurred. Instead, WKW argues that if the court dismisses the underlying tort claims in Count I and II, then Counts III and IV necessarily fail too. And WKW is right that, if a plaintiff's underlying tort claims fail, then usually their claims for negligent or wanton supervision, retention, or training also fail. (Doc. 23 at 31). But here, the court did not dismiss the underlying tort claims because Williams cannot prove they happened; the court is holding that Williams cannot establish vicarious liability. So the court must decide whether a reasonable jury could find that O'Neal committed assault and battery or invasion of privacy against Williams, regardless of whether WKW is vicariously liable for the tort.

1. *Assault and Battery*

Under Alabama law, assault and battery requires "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Atmore*, 719 So. 2d at 1193. This includes unwelcome, intentional touching with sexual overtones. *Id.* at 1193–94.

WKW argues that O'Neal's behavior wasn't an actionable battery under Alabama law, relying on *Murdoch v. Medjet Assistance, LLC*, 294 F. Supp. 3d 1242, 1276–77 (N.D. Ala. 2018). In *Murdoch*, the court emphasized that the plaintiff never objected or tried to prevent her employer's hugs and kisses on the top of her head and that there was "no evidence of a touching that had substantial sexual overtones." *Id.* at 1277.

But the facts are different here. Based on the circumstances here—*e.g.*, O'Neal's pattern of sexually suggestive conduct and Williams's immediate objection when O'Neal kissed her—a reasonable juror viewing the evidence in a light most favorable to Williams could find that a battery occurred. *See also Young v. AlaTrade Foods, LLC*, 2019 WL 4245688, at

*9 (N.D. Ala. Sept. 6, 2019) (holding that a genuine dispute of material fact existed for a battery claim when employee intentionally touched plaintiff and plaintiff "did not welcome or solicit these sexually charged touches"). So Williams has at least one underlying act that can serve as a basis for Counts III and IV.

2. *Invasion of Privacy*

Williams alleges that O'Neal invaded her privacy by intruding on her physical seclusion. (Doc. 29 at 21). Under Alabama law, an intrusion upon physical seclusion requires "(1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." *Atmore*, 719 So. 2d at 1194. "Alabama courts have generally required invasion of privacy claims to allege both ongoing persistent verbal harassment and unwanted physical contact." *Curry v. Koch Foods, Inc.*, 2019 WL 1281196, at *18 (N.D. Ala. March 20, 2019).

"Alabama law sets a high bar for what constitutes sufficiently offensive or objectionable conduct to support an invasion of privacy." *Young*, 2019 WL 4245688, at *7; *see, e.g.*, *id.* at *8 (holding evidence sufficient when employee made repeated sexually suggestive or explicit comments, made sexual gestures toward plaintiff, grabbed her from behind, blew in her ear, and showed her unsolicited pictures of his genitalia); *Busby v. Truswal Sys. Corp.*, 551 So.2d 322, 324 (Ala. 1989) (same when employee made at least 12 specific sexually suggestive or explicit comments to plaintiffs, followed plaintiffs to the restroom and after work, and stroked their necks); *Curry*, 2019 WL 1281196, at *18 (same when employee asked plaintiff for oral sex; asked graphic questions about her female anatomy; commented on her sex life; questioned her sexual orientation several times; asked her to send him pictures of herself; told her he could reach over and bite her lip; repeatedly tried to talk to her about sexual content in a book he lent her; and made a graphic threat of sexual violence toward her); *Johnson v. Wal-Mart Stores, Inc.*, 987 F.

Supp. 1398, 1404–05 (M.D. Ala. 1997) (same when employee tried to kiss or fondle plaintiff, had a physical altercation with her in his office, and made repeated comments about her looks).

Here, Williams presents evidence that O'Neal made suggestive and sexually inappropriate comments to her almost daily and that he kissed her on the cheek once. WKW argues that this is insufficient to support an invasion of privacy claim under Alabama law. (*See* Doc. 23 at 30 n.40 (citing *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287 (11th Cir. 2007) (holding evidence insufficient when plaintiff's supervisor made sexual comments and demands toward plaintiff and unzipped his zipper in front of her repeatedly); *Portera v. Winn Dixie of Montgomery*, 996 F. Supp. 1418, 1436 (M.D. Ala. 1998) (same when plaintiff's supervisor made sexual comments, touched plaintiff's buttocks, put his hand inside her blouse, and moaned while he hugged her)). The court agrees with WKW. The conduct alleged, though inappropriate, doesn't rise to the level of egregiousness that is necessary to support an invasion of privacy claim under Alabama law. Thus, an invasion of privacy can't support Williams's supervision claims.

3. *Sexual Harassment + Mishandling of Complaints*

Williams provides undisputed evidence that WKW formally disciplined O'Neal in 2018 for sexually harassing other female employees. This is sufficient to prove that the underlying sexual harassment occurred and that WKW responded to the situation. Williams also provides evidence that O'Neal sexually harassed at least four other employees, including herself, after this formal discipline. This evidence supports that WKW's handling of the sexual harassment complaint "did not cause the harassment to cease or caused it to only temporarily cease." *Andazola*, 871 F. Supp. 2d at 1226. Nor did WKW's general sexual harassment policies and training stop O'Neal's behavior.

Based on the evidence provided, a reasonable juror could find that O'Neal sexually harassed WKW employees, that employees complained to

WKW, and that WKW's handling of the complaints didn't stop his behavior.

—

In sum, Williams can meet the first requirement of proving an underlying bad act in two ways: (1) the tort of battery and (2) sexual harassment plus mishandling of the complaints. The court thus moves on to Williams's evidence that WKW knew or should have known about these incompetencies / bad acts.

**B. WKW's Knowledge of O'Neal's Incompetency**

Williams presents this evidence to show that WKW knew of O'Neal's battery and/or sexual harassment of female employees and failed to respond in a way that stopped his behavior:

- After finding that O'Neal sexually harassed women in 2018, WKW issued O'Neal the lowest level of discipline, then promoted him in an area where he worked closely with women. (Doc. 29 at 20).

- Sharon Twyman filed an EEOC charge describing O'Neal's behavior, but WKW did not discipline him. (*Id.* at 29).

- Williams complained to Barkley and Butler in July 2022 that O'Neal made inappropriate sexual comments to her, but neither reported it to anyone in a supervisory position. (Doc. 28-6, at 2).

- When Williams complained in September 2022, WKW fired O'Neal "because this was the third complaint of sexual harassment against him." (*Id.*).

- O'Neal's behavior was common knowledge among employees and supervisors in the polish department. (Doc. 22-1 at 43; Doc. 28-3 at 3, 4; Doc. 22-3 at 5, ¶ 8e).[2]

WKW argues that Williams failed to establish "that she put WKW on notice of O'Neal's behavior prior to her September 2022 complaint." (Doc. 30 at 12). But unlike notice in the vicarious liability context—where the court focuses on what WKW knew about O'Neal committing a tort against Williams—Williams doesn't need to show that WKW knew about previous problems between O'Neal and Williams. Rather, Williams needs to show that the employer was aware of O'Neal's incompetency, notice of which could be supported by O'Neal's harassment of other employees.

"[I]t is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the [employee], to leave it to the jury to determine whether they would have come to the [employer's] knowledge had the [employer] exercised ordinary care." *Mardis v. Robbins Tire & Rubber Co.*, 669 So.2d 885, 889 (Ala. 1995). Williams presents enough evidence for a reasonable juror to find that WKW knew about O'Neal's incompetency or WKW would have known if it had exercised due care. So Williams may proceed on her negligence theory in Count III.

Whether the same evidence would allow a reasonable juror to find that WKW was recklessly indifferent, as required to find wantonness, is a closer call. WKW points to its 2018 formal discipline of O'Neal, then its near immediate reaction to Williams's complaint in 2022 as evidence that it wasn't recklessly indifferent. But "wantonness is a question of fact for the jury, unless there is a total lack of evidence from which the jury could reasonably infer wantonness." *Cash v. Caldwell*, 603 So.2d 1001, 1003 (Ala. 1992).

[2] The court denies WKW's request that the court not consider certain statements of other employees (doc. 30, p.4 n.1), particularly statements that come from WKW's own investigative files or other documents that may be considered party-opponent statements. WKW retains the right to argue all evidentiary rules in pretrial motions and at trial.

—

To sum up, Williams presents enough evidence to allow a juror to find that O'Neal committed battery and sexual harassment against women and that WKW knew about O'Neal's propensity to commit these acts and did not appropriately act to prevent him from doing them to Williams. WKW does not argue that, if true, O'Neal's acts did not harm Williams. So the court **DENIES** WKW's motion for summary judgment on Counts III and IV.

## CONCLUSION

For these reasons, the court **GRANTS** WKW's motion for summary judgment on these counts:

- Count I: Assault and battery (vicarious liability)
- Count II: Invasion of privacy (vicarious liability)
- Count V: Title VII, retaliation (hostile work environment)

The court **DENIES** WKW's motion for summary judgment on these claims, which the court will set for trial:

- Count III: Negligent supervision, retention, and training
- Count IV: Wanton supervision, retention, and training
- Count VI: Title VII, retaliation (termination)

As promised in its last text order (doc. 32), the court will enter a separate order that sets a telephone status conference to discuss a trial date and pretrial deadlines.

**DONE** and **ORDERED** on September 25, 2026.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE